2025 WL 3537272

2025 WL 3537272
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

UNITED STATES of America, Plaintiff—Appellee,
v.
Holly Ann ELKINS, Defendant—Appellant.

No. 24-10753
|
FILED December 10, 2025

Appeal from the United States District Court for the Northern District of Texas, USDC No. 3:23-CR-247-1, Jane J. Boyle, U.S. District Judge

**Attorneys and Law Firms**

Jonathan Glen Bradshaw, Assistant United States Attorney (argued), Gail A. Hayworth, U.S. Attorney's Office, Northern District of Texas, Dallas, TX, for Plaintiff—Appellee.

Brett Evan Ordiway, Esq. (argued), Ordiway, P.L.L.C., Dallas, TX, Madison Lee McWithey, Udashen Anton, Dallas, TX, for Defendant—Appellant.
Before Smith, Dennis, and Richman, Circuit Judges.

**Opinion**

Priscilla Richman, Circuit Judge:

*1 Holly Ann Elkins was convicted by a jury of Count One: conspiracy to stalk, an offense under 18 U.S.C. §§ 371, 2261A(2)(A) and (B); Count Two: cyberstalking using a dangerous weapon and resulting in death, an offense under 18 U.S.C. §§ 2261A(2)(A) and (B) and punishable under § 2261(b); and Count Three: using, carrying, brandishing, and discharging a firearm during a crime of violence, an offense under 18 U.S.C. § 924(c)(1)(A)(iii). Elkins was sentenced to five years of imprisonment on Count One, a life sentence on Count Two, and a consecutive life sentence on Count Three.

Elkins challenges the life sentence imposed as a consequence of her conviction under Count Three. The predicate "crime of violence" offense for Count Three was the offense charged in Count Two. She contends that the offense for which she was convicted under 18 U.S.C. §§ 2261A(2)(A) and (B), and 2261(b), on which Count Two was based, is not a "crime of violence." She asserts that the offense does not have as an element the use, attempted use, or threatened use of physical force against the person or property of another and therefore cannot serve as a predicate offense for a conviction under § 924(c)(1)(A)(iii).

We conclude that although the offenses set forth in subsections (2)(A) and (B) of § 2261A are divisible, the jury instructions permitted the jury to convict Elkins under either subsection (2)(A) or (B), and the subsection (2)(B) offense is not categorically a "crime of violence." We do not consider whether a

**United States v. Elkins, --- F.4th ---- (2025)**
2025 WL 3537272

subsection (2)(A) offense is a "crime of violence." We vacate the conviction under Count Three and the corresponding life sentence but otherwise affirm the district court's judgment.

**I**

Holly Ann Elkins and her fiancé, Andrew Beard, stalked and harassed Beard's ex-girlfriend Alyssa Burkett, who was also the mother of Beard's child, as part of a plan to gain sole custody of the child. Elkins and Beard installed a GPS tracker on Burkett's car. Elkins made false reports to the police about Burkett. She photographed Burkett's license plate then called 9-1-1 to report, falsely, that Burkett was driving dangerously and recklessly on an interstate highway, giving the 9-1-1 operator Burkett's license plate number and a description of her vehicle. Subsequently, Elkins and Beard conspired to plant a gun and drugs in Burkett's car before Beard called the police to accuse Burkett of dealing drugs at the apartment complex where she worked. Elkins also falsely reported that Burkett's mother had assaulted her.

These schemes failed to achieve sole custody of Beard's child. Elkins encouraged Beard to take further steps. Ultimately, Beard disguised himself as a Black man, drove to Burkett's work, and shot and stabbed her to death. Elkins purchased the Maybelline Java foundation makeup that Beard smeared on his face to effect his disguise on the day of the murder. Elkins and Beard had together purchased small-gauge shotgun shells and a large knife. A jury convicted Elkins on multiple counts, and at sentencing, the district court concluded that Elkins had been the mastermind behind the couple's campaign of terror against Burkett.

**II**

**\*2** Elkins argues that an offense under 18 U.S.C. § 2261A(2) that results in death (charged in Count Two) is not a "crime of violence" and therefore may not serve as a predicate to support her conviction of conspiring to use or discharge a firearm during a "crime of violence," an offense under 18 U.S.C. § 924(c)(1)(A)(iii) (charged in Count Three). Because of the manner in which this case was submitted to the jury, it is only necessary to consider subsection (B) of § 2261A(2), and we conclude that the offense defined in that subsection is not categorically a "crime of violence."

There are two statutory definitions of "crime of violence" set forth in 18 U.S.C. § 924(c)(3). The first is 18 U.S.C. § 924(c)(3)(A), the so-called "elements clause." For an offense to be a "crime of violence" within the meaning of that subsection, the offense must have "as an element the use, attempted use, or threatened use of physical force against the person or property of another."[1] The second definition—the so-called "residual clause" contained in § 924(c)(3)(B)—has been held unconstitutional[2] and is not at issue.

To assess whether a given offense falls within the elements clause, § 924(c)(3)(A) (or a similar though not identical provision of the Armed Career Criminal Act (ACCA) that defines "violent felony"[3]), courts employ a categorical approach.[4] The offense must have as an element the use, attempted use, or threatened use of physical force.[5] That an offense *was* committed with the use, attempted use, or threatened use of physical force is of no moment;[6] if it *can* be committed *without* the use, attempted use, or threatened use of physical force, it is not a crime of violence. We must look to the "*least* serious conduct"[7] criminalized by the statute. If the commission of the offense does not necessitate the use, attempted use, or threatened use of physical force, then the offense is not a "crime of violence."

The statute at issue, entitled "Stalking," provides in subsection 2:

> Whoever—
> 
> * * *
> 
> (2) with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that--

> (A) places that person in reasonable fear of the death of or serious bodily injury to a person, a pet, a service animal, an emotional support animal, or a horse described in clause (i), (ii), (iii), or (iv) of paragraph (1)(A); or
>
> (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A),
>
> shall be punished as provided in section 2261(b) or section 2261B, as the case may be.[8]

The penalty for violating § 2261A includes "for life or any term of years, if death of the victim results."[9] The jury found that the offense charged in Count Two, under 18 U.S.C. § 2261A(2), resulted in Burkett's death.

**\*3** A threshold question we consider is whether § 2261A(2) is divisible. That means, does § 2261A(2) set forth more than one offense for purposes of determining whether Elkins was convicted of a "crime of violence"? A statute is divisible when it "sets out one or more elements of the offense in the alternative—for example, stating that burglary involves entry into a building *or* an automobile."[10]

> If one alternative (say, a building) matches an element in the generic offense, but the other (say, an automobile) does not, the modified categorical approach permits

sentencing courts to consult a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the defendant's prior conviction.[11]

When a court confronts a divisible statute, it applies the modified categorical approach to determine which "branch" of the statute formed the basis for the defendant's conviction.[12] When performing this inquiry, it may consider the indictment and jury instructions, but not the facts of the particular case.[13] It then applies the ordinary categorical approach[14] to ask whether the least serious conduct under that "branch" necessitates the use, attempted use, or threatened use of force.

Section 2261A(2) is divisible because, in separate subsections, it sets forth the elements of two distinct offenses. A defendant violates § 2261A(2)(A) when, with the specified intent, she uses certain means to "place[ ] [the victim] in reasonable fear of the death of or serious bodily injury to a person [or specified animals]." By contrast, a defendant violates § 2261A(2)(B) when, with the specified intent, she uses certain means to "cause[ ], attempt[ ] to cause, or would be reasonably expected to cause substantial emotional distress to a person described [elsewhere in § 2261A]."[15]

Count Two of the indictment asserted that Elkins violated both subsections (A) and (B) of § 2261A(2). It did not assert either of these divisible offenses in the alternative. However, the district court instructed the jury that it could convict Elkins under Count Two if it found that she committed either the offense described in subsection (A) *or* the offense described in subsection (B). Accordingly, while § 2261A(2) is divisible, the jury instruction did not require the jury to indicate which offense it found she committed. The statute was therefore not "divided," and we cannot ascertain the basis or bases for the conviction under Count Two. If either of the offenses set forth in subsections (A) and (B) is not categorically a "crime of violence," then the conviction under Count Three, which requires a predicate "crime of violence," cannot stand.

The least serious conduct that would support a conviction under § 2261A(2)(B) is that the defendant, "with intent to ... harass [or] intimidate," uses one of the means described "to engage in a course of conduct that ... would be reasonably expected to cause substantial emotional distress to a person described in [specified sections of § 2261A]." That offense does not have "as an element the use, attempted use, or threatened use of physical force against the person or property of another."[16] For instance, a defendant could satisfy the elements of § 2261A(2)(B) by engaging in a course of conduct, such as using an electronic communication service, with intent to harass, causing substantial emotional distress to the victim. No use or threatened use of force is required. Our court has sustained a conviction under § 2261A(2)(B) when the defendant "publish[ed] his ex-girlfriend's nude images and videos and exhibitionist and

masturbatory stories that he wrote in her name."[17]

**\*4** The fact that the death of the victim results as a consequence of a stalking offense defined under subsection (B) does not change our analysis. The penalty provision in § 2261(b) permits the imposition of a life sentence "if death of the victim results." It does not require that the stalker use or attempt to use or threaten to use physical force to cause the death of the victim. For example, the victim could experience such severe emotional distress from the publication of nude images and sex videos of her that she commits suicide. Her death would result from the stalking without the use, threatened use, or attempted use of physical force by the stalker.

There is an additional reason that the offense defined by § 2261A(2)(B) is not a "crime of violence" even if death of the victim results. In *Borden v. United States*,[18] the Supreme Court held that crimes that can be committed recklessly are not violent felonies within the meaning of the ACCA's analogous elements clause.[19] The plurality opinion in *Borden* reasoned that the statutory language "against the person of another" covered only purposeful and knowing acts.[20] The concurring opinion by Justice Thomas also concluded that crimes that can be committed recklessly could not be violent felonies within the meaning of the ACCA's elements clause, but that opinion rested its reasoning on the phrase "use of physical force."[21] Justice Thomas wrote, "As I have explained before, a crime that can be committed through mere recklessness does not have as an element the 'use of physical force' because that phrase 'has a well-understood meaning applying only to intentional acts designed to cause harm.' "[22] We view the holding of *Borden* as being that position taken by those Justices who concurred in the judgment on the narrowest grounds.[23] It suffices for the purpose of this case to say that an offense that can be committed recklessly cannot satisfy the elements clause of § 924(c).

The government confronts the *Borden* issue by citing our court's decision in *United States v. Conlan*,[24] asserting that § 2261A(2) "is a specific intent crime" and "the defendant must act with intent to *harm*." In *Conlan*, we rejected the argument that the terms "harass" and "intimidate" rendered § 2261A unconstitutionally vague.[25] We explained that "[a]ny vagueness concerns are further alleviated by the list of easily understood terms surrounding 'harass' and 'intimidate'—'kill, injure ... or cause substantial emotional distress'—and by the statute's scienter requirement, which narrows its scope and mitigates arbitrary enforcement."[26] But acting with intent to "cause substantial emotional distress" is not the same as "the use, attempted use, or threatened use of physical force." A person can intend to cause substantial emotional distress, and as discussed above, her conduct can recklessly cause another person to commit suicide. Such a scenario fits within subsection (B) of § 2261A(2) and the "resulting in death" provision of § 2261(b).

The government candidly recognizes in its briefing in our court that § 2261A(2) "does not

tie [its] mens rea element to 'the resulting-in-death element,' " but the government argues that "in any realistic case, the [mens rea element] must nonetheless carry forward to the resulting-in-death element," quoting the Fourth Circuit's decision in *Runyon*.[27] But the "realistic probability" test is appropriate only when assessing whether a *state* statute can serve as the predicate for a federal sentence enhancement.[28] Here, we assess whether a *federal* statute can serve as the predicate offense, and the "realistic probability" test has no place in that analysis.[29]

***5** The government's response to the suicide scenario discussed in Elkins's briefing is lacking. The government asserts:

> Elkins also posits that the hypothetical victim's death could result from the reckless *use of force* if she took "her own life" or "one of her many visitors [killed] her." ... These arguments overlook that the required specific intent to harm—to kill, injure, harass, intimidate—"modifies the cumulative course of conduct as a whole," such that "the resulting-in-death element" [sic] must "carry forward to the resulting-in-death element."[30]

First, § 2261A(2)(B) does not require a "use of force." An offense can be committed when the defendant intends to harass or intimidate the victim and uses specified means to engage in a "course of conduct" that "causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress."[31] That offense does not have as an element the use or threatened use of physical force against the person or property of another.

Second, the "specific intent" can be, as the government recognizes, intent to harass or intimidate. That is not an intent to kill or physically harm another person.

Third, the "resulting-in-death" element is contained in § 2261(b)(1). That provision does not require that the defendant used, attempted to use, or threatened to use physical force against the victim. It does not even require that the defendant contemplated use or threatened use of physical force. It only requires that the "death of the victim results" from the defendant's conduct. The death of the victim can result from reckless conduct, such as posting photos on the internet, motivated by intent to harass or intimidate.

Fourth, our decision in *Conlan* did not "carry forward" the resulting-in-death element in § 2261(b)(1), the penalty statute, into the intent elements in § 2261A(2)(B), or vice versa. Our decision in *Conlan* addressed the "fear that § 2261A criminalizes 'otherwise legal actions—such as sending a letter or traveling from one state to another ... even if some of those actions were undertaken without any ill intent.' "[32] In explaining why that fear was "unfounded," we looked to the statutory definition of "course of conduct" in 18 U.S.C. § 2266(2) and the Fourth Circuit's decision in *United States v. Shrader*.[33] We said in *Conlan* that § 2266(2) "makes clear that [§ 2261A's] intent requirement 'modifies the cumulative course of conduct as a whole,' and 'avoids

sweeping up innocent acts.' "[34] Our decision in *Conlan* did not purport to "carry forward" a use-of-force element into every offense under § 2261A(2)(B) that results in the death of the victim.

Finally, the government's assertion that a resulting-in-death element is imported from § 2261(b)(1) into § 2261A(2)(B) is inconsistent with its recognition earlier in its brief that § 2261A(2) "does not tie [its] mens rea element to 'the resulting-in-death element.' "

**\*6** The government's arguments regarding an offense resulting in the death of the victim have considerable commonsensical appeal. However, commonsensical appeal has not been the defining characteristic of the categorical approach and determining what constitutes a "crime of violence" or a "violent felony."[35]

The government relies on *In re Hall*[36] for the proposition that if death of a person results, an enhanced sentence of up to life in prison is applicable under § 2261(b)(1). Our holding in *Hall* in this regard[37] has been called into question by *Borden*. In *Hall*, we concluded that kidnapping resulting in death was a crime of violence—despite the fact that "kidnapping" might occur via force-free inveiglement, and death might then result recklessly, for example, via a car crash with the inveigled kidnapping victim in the vehicle.[38] We reasoned that the use of force was "*not* limited to the intentional or knowing use of force—it also includes conduct that recklessly disregards the risk of injury to another person."[39] But in *Borden*, the Supreme Court held the opposite[40] and vacated an Eighth Circuit decision[41] on which our decision in *Hall* had relied for support.[42] The *Borden* decision did not, however, call into question the additional, alternative holding in *Hall* that a conviction for the capital crime of kidnapping resulting in death under 18 U.S.C. § 3591(a)(2) is a crime of violence because § 3591(a)(2)(A) requires a finding beyond a reasonable doubt that the defendant "intentionally killed the victim."[43]

A defendant who stalks a victim using any of the means set forth in § 2261A, intending to harass the victim and cause severe emotional distress, and who recklessly triggers their suicide, has engaged in culpable conduct. But they need not have used, threatened to use, or attempted the use of force against a person to be convicted under §§ 2261A(2)(B) and 2261(b). We therefore hold that an offense under § 2261A(2)(B) resulting in punishment based on the death of the victim under § 2261(b) is not a crime of violence within the meaning of § 924(c)'s elements clause. Elkins's conviction and sentence on Count Three must be vacated. We do not address whether § 2261A(2)(A) standing alone, or §§ 2261A(2)(A) and 2261(b) together, is a crime of violence within the meaning of § 924(c)'s elements clause.

## III

**\*7** This leaves the question of Elkins's sentences under Count One and Count Two.[44] Elkins argues that they must be vacated and

remanded for resentencing if the conviction and sentence under Count Three is vacated.

Resentencing is required "when the sentences or counts are interrelated or interdependent—for example, when the reversal of the sentence on one count *necessarily* requires the review of the entire sentence."[45] That is not the case here. The record does not suggest that Count Three influenced the district court's application of the Sentencing Guidelines to Counts One and Two. Elkins's Presentence Report (PSR) grouped Counts One and Two and applied the cross-reference for first-degree murder, yielding a base offense level of 43 and a guideline range of life imprisonment. At sentencing, the district court adopted the PSR's findings. Count Three was not grouped with Counts One and Two, nor was it part of a sentencing package, nor did the sentence for Count Three run concurrently with those for Counts One and Two.

Elkins also argues that vacatur of Count Three would permit the court to apply a USSG § 2A6.2(b)(1) enhancement for possession or threatened use of a dangerous weapon to Counts One and Two[46]—and thus this court should vacate for a full resentencing hearing. This argument lacks force. Elkins already received life imprisonment on Count Two; it is implausible that the district court would seek to impose an additional enhancement. Accordingly, we decline to disturb Elkins's sentences on Counts One and Two.

**IV**

Elkins challenges her convictions for Counts One and Two on the grounds that as applied to her conduct, the cyberstalking statute exceeds Congress's Commerce Clause power. She raised this question of law in the district court, and thus we review it *de novo*. However, Elkins recognizes that her argument is foreclosed, and she makes it to preserve the issue for further review.

In *United States v. Lopez*,[47] the Supreme Court identified three categories of activities Congress may regulate under its Commerce Power: (1) the use of the channels of interstate commerce; (2) the instrumentalities of interstate commerce; and (3) activities that substantially affect interstate commerce.[48] The use of a phone—even intrastate—involves the use of an instrumentality of interstate commerce.[49] The indictment alleged that Elkins used or facilitated phone use four times while committing the conspiracy to stalk and cyberstalking. We therefore agree that Elkins's as-applied challenge to the cyberstalking statute is foreclosed.

**V**

*\*8* Elkins raises two further challenges to the district court's conduct of her trial. First, she alleges that the district court violated her due process right when the court prevented her from offering her own gloss on the meaning of reasonable doubt. Next, she offers this exercise of the trial court's discretion as an example of what she contends was judicial bias against her. Elkins preserved her objection to being

prevented from offering a gloss on reasonable doubt during her closing argument, and she raised her objection to the fundamental fairness of her trial at sentencing. Because the issue is preserved, we review the rulings of a district court concerning statements made during a closing argument for abuse of discretion.[50] We review her claim of judicial partiality for whether any errors by the trial court were so substantial as to prejudice her case.[51]

The Fifth Circuit's pattern jury instructions, used at Elkins's trial, define proof "beyond a reasonable doubt" as "proof of such a convincing character that you would be willing to rely and act upon it without hesitation in making the most important decisions of your own affairs."[52] During voir dire, defense counsel suggested that whether "to remove my child's life support" would be such a decision. The district court interjected that it did not "know if that is the standard, but go ahead."

In closing, defense counsel returned to the life-support theme: "[W]hen you're thinking about the most important decisions, think about a loved one on life support." The district court interjected: "No, no, no, no. That—I don't think that's reasonable doubt. I think that's all doubt, and I'm not going to let you go through that again because I disagreed with it on Opening and I disagree with it now." Defense counsel objected for the record. After closing arguments, the district court properly instructed the jury on reasonable doubt in line with the pattern instruction. It further instructed the jury to "not assume from anything I may have done or said during the trial that I have any opinion concerning any of the issues in this case" and that jurors "should disregard anything I may have said during the trial" except for "instructions ... on the law."

The district court is the "governor of the trial process, vested with the duty to insure that the law is properly administered,"[53] and may properly interrupt, comment, or clarify in the presence of the jury.[54] It is a constitutional requirement that the jury be instructed "on the necessity that the defendant's guilt be proved beyond a reasonable doubt."[55] It is not a constitutional requirement that—given the presence of a proper instruction—counsel be permitted to offer their own gloss on the standard.[56] A proper instruction was present in this case; nothing more was needed. Assuming *arguendo* that Elkins's life-support gloss on reasonable doubt was a fair example of "the most important decisions of your own affairs," the district court did not abuse its discretion when it prevented her from offering it.

**\*9** Elkins alleges that the district court's refusal to entertain her life-support hypothetical—when paired with other interruptions at trial—created the appearance of partiality toward the government. Because a trial judge has enormous influence on the jury, we view these assertions seriously.[57] However, the issue is not "whether the trial judge's conduct left something to be desired, or even whether some comments would have been better left unsaid. Rather, we must determine whether the judge's behavior was so

prejudicial that it denied [the appellants] a fair, as opposed to a perfect, trial."[58]

The district court afforded Elkins a fair trial. Where the district court did make a stray remark, it offered curative instructions. For instance, during Elkins's examination of a witness, the district court sustained the prosecution's objection to a speculative question: "Sustained. And I don't think it's true, but sustained anyway." This was a comment on the veracity of Elkins's assertion, contained within the speculative question, that she and Beard had hired an investigator "to do work for the custody dispute." The district court should not have offered it.[59] But the district court recognized as much and gave a specific curative instruction: "I shouldn't have said that ... I don't mean it at all. You should not consider that in any way as any evidence in the case." It also offered general curative instructions, delineating the role of judge and jury, when it formally charged the jury. While "[s]ome comments ... may be so prejudicial that even good instructions will not cure the error,"[60] this district court's isolated unguarded remarks over the course of a seven-day trial are not among them. Our review of the record does not suggest that "the district judge's actions, viewed as a whole ... amount[ed] to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor."[61]

Nor do we find merit in Elkins's assertion that she was interrupted unduly frequently. Elkins asserts that the defense's presentation was interrupted at least a dozen times. But a judge's active participation in keeping a trial on track is not error.[62] Our review of the interruptions cited by the defense largely reveals a trial judge's asking clarifying questions and evenhandedly enforcing the rules of evidence. The district court also interrupted the prosecution—even without an objection by the defense—to cut off inappropriate lines of questioning. On balance, we see nothing in this experienced trial judge's conduct that "convey[ed] to the jury an impression of partiality toward the government to such an extent that it became a factor in their deliberations."[63] If anything, the trial court was scrupulously protective of Elkins's right to present a defense: it permitted her to qualify a defense witness as an expert in the field of makeup, and then to have the expert apply contouring makeup to Elkins's face in front of the jury.

## VI

**\*10** Because we vacate Elkins's conviction and sentence under Count Three, we do not reach her argument that the district court misconstrued the Sentencing Guidelines range for that Count.

\* \* \*

Elkins's conviction and sentence under Count Three is VACATED. In all other respects, the district court's judgment is AFFIRMED.

James L. Dennis, Circuit Judge, concurring:

I write separately to make explicit what the majority opinion, in its careful phrasing, necessarily establishes: *Borden v. United States*, 593 U.S. 420, 141 S.Ct. 1817, 210 L.Ed.2d 63 (2021), abrogated *In re Hall*, 979 F.3d 339 (5th Cir. 2020), in at least two respects. First, *Hall*'s holding that crimes committed with a *mens rea* of recklessness satisfy the elements clause has been abrogated. 979 F.3d at 344–46. Second, *Hall*'s application of the realistic probability test outside its limited context of federal courts interpreting state statutes has likewise been abrogated. *Id.* at 345, 347; *see also United States v. Taylor*, 596 U.S. 845, 859, 142 S.Ct. 2015, 213 L.Ed.2d 349 (2022) ("[N]o such federalism concern is in play here.").

We are therefore not following *Hall* today because *Borden* and its progeny supply an intervening change in the law. *See Burge v. Par. of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999) (citing *Billiot v. Puckett*, 135 F.3d 311, 316 (5th Cir.), *cert. denied*, 525 U.S. 966, 119 S.Ct. 413, 142 L.Ed.2d 336 (1998)) ("It is a firm rule of this circuit that in the absence of an intervening contrary or superseding decision by this court sitting en banc or by the United States Supreme Court, a panel cannot overrule a prior panel's decision.").

**All Citations**

--- F.4th ----, 2025 WL 3537272

## Footnotes

1   18 U.S.C. § 924(c)(3)(A).

2   See *United States v. Davis,* 588 U.S. 445, 470, 139 S.Ct. 2319, 204 L.Ed.2d 757 (2019).

3   18 U.S.C. § 924(e)(2)(B)(i).

4   See *Taylor v. United States,* 495 U.S. 575, 600, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990) (discussing the categorical approach as applied to § 924(e)).

5   18 U.S.C. § 924(c)(3)(A).

6   See *Mathis v. United States,* 579 U.S. 500, 510, 136 S.Ct. 2243, 195 L.Ed.2d 604 (2016) ("[W]e consider [only] the *elements of the offense* [,] without inquiring into the specific conduct of this particular offender." (alteration in original) (quoting *Sykes v. United States,* 564 U.S. 1, 7, 131 S.Ct. 2267, 180 L.Ed.2d 60 (2011))).

7   See *Borden v. United States,* 593 U.S. 420, 441, 141 S.Ct. 1817, 210 L.Ed.2d 63 (2021).

8   18 U.S.C. § 2261A(2).

9   18 U.S.C. § 2261(b)(1).

10  *Descamps v. United States,* 570 U.S. 254, 257, 133 S.Ct. 2276, 186 L.Ed.2d 438 (2013).

11  *Id.*

12  *Id.*

13  See *id.* at 264 n.2, 133 S.Ct. 2276 (listing approved documents for conducting the analysis as "indictment, jury instructions, plea colloquy, and plea agreement").

14  *Id.* at 257, 133 S.Ct. 2276.

15  *Cf. United States v. Yung,* 37 F.4th 70, 76 (3d Cir. 2022) (describing § 2261A(2) as requiring an act, an intent, and one of two alternative results outlined by (2)(A) and (B)).

16  18 U.S.C. § 924(c)(3)(A).

17  *United States v. Uhlenbrock,* 125 F.4th 217, 220 (5th Cir. 2024), *cert. denied,* ––– U.S. ––––, 145 S. Ct. 2853, ––– L.Ed.2d ––––  (2025).

18  593 U.S. 420, 141 S.Ct. 1817, 210 L.Ed.2d 63 (2021) (plurality opinion).

19  *Id.* at 429, 141 S.Ct. 1817; *cf. United States v. Manley,* 52 F.4th 143, 145 (4th Cir. 2022) (observing that the ACCA elements clause at issue in *Borden* is "materially similar" to the elements clause in § 924(c)).

20  *Borden,* 593 U.S. at 430-32, 141 S.Ct. 1817.

21  *Id.* at 446, 141 S.Ct. 1817 (Thomas, J., Concurring).

22  *Id.* (quoting *Voisine v. United States,* 579 U.S. 686, 713, 136 S.Ct. 2272, 195 L.Ed.2d 736 (2016) (Thomas, J., dissenting)).

23  *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977).

24  786 F.3d 380 (5th Cir. 2015).

**United States v. Elkins, --- F.4th ---- (2025)**
2025 WL 3537272

| | |
|---|---|
| 25 | *Id.* at 385-86. |
| 26 | *Id.* at 386. |
| 27 | See *United States v. Runyon*, 994 F.3d 192, 203 (4th Cir. 2021) ("While these mens rea elements are not explicitly tied to the resulting-in-death element, in any realistic case, they must nonetheless carry forward to the resulting-in-death element."). |
| 28 | *United States v. Taylor*, 596 U.S. 845, 858-59, 142 S.Ct. 2015, 213 L.Ed.2d 349 (2022); *see also United States v. Minor*, 121 F.4th 1085, 1093 n.9 (5th Cir. 2024) ("We continue to apply that realistic probability test to state court convictions, but application to federal statutes should no longer apply as made clear by the Supreme Court and referenced by us."). |
| 29 | *Minor*, 121 F.4th at 1093 n.9. |
| 30 | (emphasis added) (first quoting *Conlan*, 786 F.3d at 386 then quoting *Runyon*, 994 F.3d at 203). |
| 31 | 18 U.S.C. § 2261A(2)(B). |
| 32 | *Conlan*, 786 F.3d at 386. |
| 33 | *Id.*; *see United States v. Shrader*, 675 F.3d 300 (4th Cir. 2012). |
| 34 | *Conlan*, 786 F.3d at 386 (quoting *Shrader*, 675 F.3d at 311-12). |
| 35 | See *United States v. Rodriguez*, 711 F.3d 541, 545 n.2 (5th Cir. 2013) (en banc) (observing that "confusion and gymnastics" frequently attend the task of defining "crime of violence"), *abrogated in part by, Esquivel-Quintana v. Sessions*, 581 U.S. 385, 137 S.Ct. 1562, 198 L.Ed.2d 22 (2017). |
| 36 | 979 F.3d 339 (5th Cir. 2020). |
| 37 | *Id.* at 344 ("The federal kidnapping resulting in death provision involves different elements of conviction from the general federal crime of kidnapping—namely, the additional requirement that 'the death of [a] person results'—and triggers an enhanced penalty. Accordingly, we conclude that kidnapping resulting in death is a different offense than generic kidnapping." (citations omitted)). |
| 38 | *Id.* at 344-46. |
| 39 | *Id.* at 344 (emphasis added); *see also id.* ("[K]idnapping *resulting in death*, necessarily contemplates the reckless disregard of the risk of serious injury to the victim" and "[s]o '[w]here a perpetrator intentionally kidnaps a victim, and the kidnapping results in the victim's death, the perpetrator's mental state is sufficient to show that he necessarily "used" force against the victim.' " (quoting *United States v. Ross*, 969 F.3d 829, 839 (8th Cir. 2020) (alteration in original))). |
| 40 | See *Borden v. United States*, 593 U.S. 420, 429, 141 S.Ct. 1817, 210 L.Ed.2d 63 (2021) ("We must decide whether the elements clause's definition of 'violent felony'—an offense requiring the 'use of physical force against the person of another'—includes offenses criminalizing reckless conduct. We hold that it does not." (footnote omitted)). |
| 41 | See *King v. United States*, ––– U.S. ––––, 142 S. Ct. 332, 211 L.Ed.2d 175 (2021) (Mem) (vacating *King & Ross v. United States*, 969 F.3d 829 (8th Cir. 2020)). |
| 42 | *Hall*, 979 F.3d at 344 (citing *Ross*, 969 F.3d at 839). |
| 43 | *Id.* at 345-46. |
| 44 | See *United States v. Clark*, 816 F.3d 350, 360 (5th Cir. 2016) ("In some cases, when we reverse convictions or sentences on fewer than all counts, the aggregate sentence must be unbundled, and the defendant must be resentenced on all counts."). |
| 45 | *Id.* |
| 46 | See *United States v. Benbrook*, 119 F.3d 338, 339 (5th Cir. 1997) (noting that a defendant sentenced under § 924(c) cannot also be |

**United States v. Elkins, --- F.4th ---- (2025)**
2025 WL 3537272

| | |
|---|---|
| | subjected to a dangerous weapon enhancement). |
| 47 | 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). |
| 48 | *Id.* at 558-59, 115 S.Ct. 1624. |
| 49 | See *United States v. Marek*, 238 F.3d 310, 318-19 (5th Cir. 2001) ("[I]ntrastate use of interstate facilities is properly regulated under Congress's second-category *Lopez* power ... Interstate commerce facilities that have created a criminal federal jurisdictional nexus during intrastate use include telephones, automobiles, and airplanes." (citations omitted)). |
| 50 | *United States v. Griffin*, 324 F.3d 330, 361 (5th Cir. 2003). |
| 51 | *United States v. Williams*, 809 F.2d 1072, 1090-91 (5th Cir. 1987). |
| 52 | Fifth Circuit Pattern Criminal Jury Instructions § 1.05 (2024). |
| 53 | *United States v. Jacquillon*, 469 F.2d 380, 387 (5th Cir. 1972). |
| 54 | See *United States v. Hawkins*, 661 F.2d 436, 450 (5th Cir. Unit B Nov. 1981). |
| 55 | *Victor v. Nebraska*, 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). |
| 56 | See *Miles v. United States*, 103 U.S. 304, 312, 26 L.Ed. 481 (1880) ("Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury."); *cf.* *United States v. Pinkney*, 551 F.2d 1241, 1244 (D.C. Cir. 1976) ("Judicial attempts to clarify the meaning of the phrase 'reasonable doubt' by explanation, elaboration or illustration ... more often than not tend to confuse or mislead."). |
| 57 | *United States v. Williams*, 809 F.2d 1072, 1086 (5th Cir. 1987). |
| 58 | *Id.* (quoting *United States v. Pisani*, 773 F.2d 397, 402 (2d Cir. 1985)). |
| 59 | See *United States v. Cisneros*, 491 F.2d 1068, 1076 (5th Cir. 1974) (observing that when credibility issues before the jury are close and important, "commenting on the evidence is a perilous endeavor, to be undertaken with caution"). |
| 60 | *Williams*, 809 F.2d at 1088. |
| 61 | *United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir. 1994). |
| 62 | See *United States v. Hawkins*, 661 F.2d 436, 450 (5th Cir. Unit B Nov. 1981). |
| 63 | *Williams*, 809 F.2d at 1091 (quoting *United States v. Pisani*, 773 F.2d 397, 404 (2d Cir. 1985)). |

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.